**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Emily A.N.V.,

Petitioner,

v.

Todd Blanche, *Acting Attorney General*, Markwayne Mullin, *Secretary, US. Department of Homeland Security*, Todd M. Lyons, *Acting Director of Immigration and Customs Enforcement*, David Easterwood*, Acting Director, St. Paul Field Office Immigration and Customs Enforcement*, Eric Tollefson, *Sheriff of Kandiyohi County*,

Respondents.

Case No. 26-cv-2570-KMM-EMB

**REPORT AND RECOMMENDATION**

---

Before the Court is Petitioner Emily A.N.V.'s[1] petition for a writ of habeas corpus (Dkt. No. 1) under 28 U.S.C. § 2241. The government filed a response (Dkt. No. 5) to the petition, and Emily's counsel filed a reply (Dkt. No. 7). The petition was referred to me to issue a Report and Recommendation. *See* 28 U.S.C. § 636; D. Minn. L.R. 72.1.

---

[1] This District uses the first name and last initials of nongovernmental parties in immigration cases. Petitioner is referred to by just her first name in the rest of this Report and Recommendation.

I held an evidentiary hearing on July 1, 2026, admitting into evidence ten exhibits on the parties' stipulation (referred to here as Exs. 1–10) and taking testimony of two witnesses: Emily and Department of Homeland Security ("DHS") Customs and Border Patrol ("CBP") Agent David Marcus. (*See* Dkt. No. 20; *see also* Dkt. No. 23-1 ("Tr.").) Following the hearing, the government filed supplemental briefing (Dkt. No. 21), as did Emily's counsel (Dkt. No. 22).

Based on the parties' filings and the record evidence, I recommend that the Court grant Emily's petition.

## I. Background

Emily is a twenty-two-year-old citizen of Venezuela and resident of Grand Forks, North Dakota. (Pet. ¶ 7; Tr. at 10.) She came to the United States around May 2024, fleeing persecution in Venezuela. (Pet. ¶¶ 16–17; Tr. at 10.) Immigration authorities determined that she had a credible fear of returning to her home country. (Ex. 2 at 3–4 (describing Emily's "positive fear claim" and fear of threats received from officials in Venezuela); *see also* Pet. ¶ 17.) She was therefore placed in proceedings to seek protection-based relief, including asylum, before an immigration judge. (Ex. 2 at 3; Pet. ¶ 17.) Emily's claim for relief is pending appeal in the immigration-court system. (Tr. at 15; Pet. ¶ 20.)

During the pendency of her asylum proceedings, Emily was instructed to attend "check-in" appointments with the Enforcement and Removal ("ERO") unit of DHS's Immigration and Customs Enforcement ("ICE") branch every four months. (Tr. at 15.) She never missed an appointment. (Tr. at 15; *see also* Ex. 2 at 3 ("[Emily] is currently on an ERO docket and checking in.").)

Emily has no criminal history. (Ex. 2 at 4.) She is about "one meter, 54 centimeters" (or five feet and one-half inch) tall and weighs 92 pounds. (Tr. at 11.) She speaks Spanish and does not understand English. (Tr. at 3, 36.)

Around 8:45 a.m. on February 26, 2026, CBP agents of the Grand Forks Sector Intelligence Unit launched an enforcement operation to apprehend Emily's partner, Orlando, whom they believed lacked lawful immigration status. (Tr. at 22, 25–26.) At that time, Orlando was sitting in the driver's seat of his car, which was parked outside his apartment building in Grand Forks. (Tr. at 10, 26.) The car was running, and the reverse lights were on before agents approached. (Ex. 5 at 2:12–2:15; *see also* Tr. at 12–13.)

Emily was sitting in the front passenger seat of his car. (Tr. at 10, 27–28.) As the agents began the operation, they did not know Emily's name, alienage, or relationship to Orlando. (*Id.* at 28.) They were not targeting her, and they had no warrant for her arrest. (*Id.* at 13–14, 25.)

Agents approached Orlando's car and told him to roll down his windows. (Ex. 6 at 2:00.) He retrieved his wallet, extracted a photo ID, and held it up to the window. (Ex. 6 at 2:00–2:18; Ex. 3 at 2:16–2:22; Ex. 5 at 2:35–2:38.). Agents yelled his first name repeatedly and told him to roll down his window. (Ex. 6 at 2:14–2:22.) Meanwhile, Agent Scarborough, Agent Marcus, and at least one other agent approached the front passenger-side of the car, where Emily was sitting. (Ex. 6 at 2:00–2:20.)

In all, about seven agents and a canine agent surrounded the vehicle. (Tr. at 37.) Video footage reflects a chaotic scene, with agents yelling and speaking over one another. (Ex. 6 at 2:01–2:30.) Emily turns her head from side to side, looking to the agents speaking to Orlando through his window, then to the agents at her window, and then back to the driver's side. (*Id.*)

About twenty-two seconds after approaching her window, Agent Scarborough knocked on Emily's window (Ex. 6 at 2:20–2:22) and told her "to get out of the vehicle." (Tr. at 18; *see also* Ex. 6 at 2:22.) Other agents were yelling at Orlando at the same time. (Ex. 6 at 2:15–28.) Emily, whose window was rolled up, "d[idn't] understand what [Agent Scarborough was] saying." (Tr. at 17–18.) Orlando gestured to put the car (which was still in reverse) into park, and Emily turned to look toward the agents at his window. (Ex. 6 at 2:22–2:28; Tr. at 13.) A few seconds later, agents shattered Orlando's window. (Ex. 6 at 2:27.)

Emily screamed and began recording on her phone with her right hand while placing her left hand on her chest, which was rising and falling rapidly. (Ext. 6 at 2:27–2:38; *see also* Tr. at 13.) She testified, "I was so – so much in panic." (Tr. at 13.) Agent Scarborough told Emily, "Get out of the vehicle. Get out of the vehicle, Ma'am," and Emily unbuckled her seatbelt and reached for the passenger-side door. (Ex. 6 at 2:30–2:41.)

As Emily reached for the door handle, agents "used force" to throw Orlando to the ground, and Emily turned to look. (Ex. 6 at 2:41–2:44; Tr. at 13, 38; Ex. 3 at 2:40–2:56.) With Emily turned the other way, Agent Scarborough opened the door and pulled her out of the car, where three agents surrounded her. (Ex. 6 at 2:44–2:50, 3:20–3:30.) She was not wearing a coat or shoes. (*Id.* at 3:41–3:46.) Her phone fell, and she slipped and "took a couple steps" trying to pick it up. (Tr. at 53–54; Ex. 4 at 2:42–2:44.)

Agent Scarborough ripped off one of Emily's fingernails while pulling her out of the car. (Tr. at 19.) Video footage shows her holding up her bleeding finger and flailing her arm, which she testified she did "because it was hurting." (Ex. 6 at 2:50–2:55,4:42–4:46; Tr. at 19.) Agent Scarborough then handcuffed her as she "tighten[ed] up" her arms and yelled, "Por favor!," "No!," and "Orlando!" (Tr. at 20; Ex. 6 at 2:56–3:18.) Several agents then escorted her across the icy parking lot to a law-enforcement vehicle and placed her in the backseat. (Ex. 6 at 3:20–3: 47.)

From the time Agent Scarborough knocked on Emily's window to the time he pulled her from the car, about thirty seconds passed; within thirty more seconds she was handcuffed and escorted to the agents' vehicle. Agent Scarborough "had a hold of her arm the whole time," from when he pulled her from Orlando's car to when he placed her in the agents' vehicle. (Tr. at 36.)

Once Emily was handcuffed in the backseat of the law-enforcement vehicle, agents adopted a leisurely pace, repeatedly walking back and forth between the agents' vehicle and Orlando's. Agent Scarborough buckled Emily in and asked her age (she replied, "twenty-two") and where she was from (answer, "Venezuela.") (Ex. 6 at 3:55–4:10; Ex. 4 at 3:54–4:00.) He walked back to Orlando's car and searched its central console. (Ex. 6 at 4:50–5:18.)

Agent McIntee said they should "check her status." (Ex. 7, 4:12–4:14; Tr. at 44.) He then approached Emily in the agents' vehicle and asked if she had identification. (Tr. at 44.) Emily said, "It's in the car." (*Id.* at 45; Ex. 7 at 4:40–4:45.) Despite acknowledging to other agents that she had ID in the car, Agent McIntee told them to "take off and bring her to . . . sector headquarters for processing" without first searching for her ID. (Tr. at 46; *see also* Ex. 7 at 6:10–6:20.) Agents "later did find an identification in her bag." (Tr. at 45.)

Agent Marcus testified that CBP agents arrest "everybody if they're unlawfully in the United States." (Tr. at 51.) He did not testify, nor did any videos show, that agents told Orlando why he was being arrested. Agent Marcus did testify that agents had no reason to believe during the operation that Emily lacked immigration status. (*Id.* at 28.) He acknowledged that agents did not ask her name, status, or address. (*Id.* at 29.) He testified that he did not witness her commit a criminal offense in his presence. (*Id.* at 36.)

Agent Marcus testified that "the reason that [Emily] was detained is because she refused to get out of the vehicle and we were unable to identify her in the field." (Tr. at 34.) He testified that she fell while they pulled her from the vehicle and that he believed she was trying to escape. (*Id.* at 53–54.) He said he was "surprised" at the effort it took to get her arm behind her back when Agent Scarborough handcuffed her. (*Id.* at 54.) In his opinion, Emily was "resisting arrest." (*Id.* at 55.)

After she was in the vehicle, Agent Marcus testified that Emily "refused to give ID and stated she was from Venezuela," which he said established probable cause to arrest her. (Tr. at 35.) However, Agent Marcus also testified that Emily directed Agent McIntee to Orlando's car to obtain her ID card. (*Id.* at 44–45.) He testified that Emily was taken to "sector headquarters for processing" without ever looking for her ID in the car. (*Id.* at 46.)

Agent Marcus testified that "it's pretty common that another person is not going to stick around" once their partner is arrested. (Tr. at 56.) He therefore did not "think [Emily] would have remained around for [agents] to go and get a warrant" and testified, "[i]t's very possible she would not have been in town anymore." (*Id.*) Agent Marcus admitted that agents did not ask if she had a local address, a job, or family in the community. (*Id.* at 47–48.) Emily called several family members after she was taken to sector headquarters. (Ex. 2 at 4.)

Emily has been in immigration custody since her arrest. (Pet. ¶ 7.)

## II. Legal Standard

The Court may grant a writ of habeas corpus when a person demonstrates by a preponderance of the evidence that she is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see also Rasul v. Bush*, 542 U.S. 466, 473 (2004); *Maldonado v. Olson*, 795 F. Supp. 3d 1134, 1143 (D. Minn. 2025). The right to challenge unlawful detention under § 2241 "extends to those persons challenging the lawfulness of immigration-related detention." *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 900–01 (D. Minn. 2020) (citing *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001)); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004).

## III. Discussion

Emily first argues that she is entitled to habeas relief because her arrest was unlawful. Even if her arrest was lawful, Emily next argues that her detention following arrest is unlawful, warranting relief.

### A. Arrest

The parties agree that Emily "was initially arrested without a warrant." (Gov't Resp. Br. at 20; *see* Pet. ¶ 68.) The parties also agree that the "question" before the Court "is whether [Emily's] warrantless arrest conformed to § 1357." (Gov't Resp. Br. at 20; *see* Pet. ¶¶ 40–47, 67–70.)

Section 1357 authorizes immigration agents "to arrest [without a warrant] any alien in the United States" under circumscribed conditions. 8 U.S.C. § 1357. The government initially argued that two of those circumstances are relevant here. ***First***, an agent may arrest without a warrant an alien who commits a federal offense in the agent's presence. *Id.* § 1357(a)(5)(A). ***Second***, an agent may make a warrantless arrest if the agent "[1] has reason to believe that the alien so arrested is in the United States in violation of any [immigration] law or regulation ***and*** [2] is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2) (emphasis and brackets added); *see Arizona v. United States*, 567 U.S. 387, 408 (2012). "'Reason to believe' . . . means constitutionally required probable cause." *United States v. Diaz Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010).

**1. Authority to make a warrantless arrest on suspicion of harboring an unlawful alien.**

The government claims that agents had authority to arrest Emily under § 1357(a)(5)(A) because they had probable cause to believe she violated 8 U.S.C. § 1324(a)(1)(A)(iii). (Gov't Resp. Br. at 21–22.) The record does not support this claim.

Section 1324(a)(1)(A)(iii) makes it a crime for a person to conceal, harbor, or shield from detention (or to so attempt) an alien if the person knows or recklessly disregards the fact that the alien is in the United States unlawfully. 8 U.S.C. § 1324(a)(1)(A)(iii). Here, the government argues, "Petitioner's unwillingness to comply with commands to open the vehicle and exit were a clear attempt to impede the arrest of the driver, and constituted an act of concealing, harboring, or shielding him from detection." (Gov't Resp. Br. at 21.) The government further claims that "Petitioner clearly knew or chose to disregard the fact that [Orlando] was in the country unlawfully, because . . . agents were placing him under arrest for just that." (*Id.* at 22.) This, the government claims, gave agents "more than probable cause to believe she was guilty of a crime committed in their presence," making her warrantless arrest "entirely justified." (*Id.*)

The government cites no record evidence to support this argument.

Indeed, the argument is contradicted by the record evidence. In his testimony, Agent Marcus stated that agents did not witness Emily commit a crime. (Tr. at 36.) He testified that the reasons for Emily's arrest were her refusal to exit the vehicle and identify herself. (*Id.* at 34–35.) Similarly, the I-213 "Record of Deportable / Inadmissible Alien" Form that Agent Marcus signed on the day of arrest states that "the reason [Emily] was taken into custody is because she refused to comply and answer questions, otherwise she was not going to be taken into custody." (Ex. 2 at 3.) Moreover, nothing in the I-213 Form, video footage, or testimony shows that agents explained why Orlando was being detained or indicates that Emily was aware of his status. And no evidence shows her trying to harbor, conceal, or shield him from agents.

The evidence does not establish probable cause to believe that Emily sought to harbor, conceal, or shield Orlando from detention or recklessly disregarded the fact that he was unlawfully present. Perhaps because of the total lack of support in the record, the government abandoned its § 1357(a)(5) argument in its post-hearing briefing. Instead, the government focused exclusively on its § 1357(a)(2) argument: that there was reason to believe Emily was unlawfully present and likely to escape, justifying a warrantless arrest. I turn to that argument.

**2. Authority to make a warrantless arrest on reasonable belief of unlawful presence and likely escape.**

Section 1357(a)(2) authorizes immigration agents to arrest someone without a warrant if they reasonably believe the person is (1) unlawfully present and (2) likely to escape before they can obtain a warrant. 18 U.S.C. § 1357(a)(2). The government claims both prongs of § 1357(a)(2) were satisfied here. It bears the burden of proof. *See Jefferson G.H.L. v. Blanche*, No. CV 26-2344-JRT-ECW, 2026 WL 1229623, at *3 (D. Minn. May 5, 2026).

***First***, the government argues that agents had reason to believe Emily was unlawfully present because she was "with a driver being arrested" (Gov't Resp. Br. at 22), was "unwilling[] to comply with commands" to exit the vehicle (*id.*), "attempt[ed] to flee once she was out of the vehicle" (*id.*), and "admitted that she was from Venezuela and did not have legal documentation to be in the United States" (Gov't Supp. Br. at 4).

The evidence doesn't support this argument. That Emily was in the car with Orlando didn't create reasonable belief that she was unlawfully present. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975) (neither apparent foreign ancestry nor reasonable belief that other aliens were in car creates reasonable belief of passenger's alienage). And the record evidence supports Emily's testimony that she did not refuse to comply with orders. (*See* Pet'r Decl. (Dkt. No. 8) ¶¶ 2, 5; Tr. at 11–13.)

I find credible Emily's testimony that she did not initially understand Agent Scarborough's initial command to exit. (Tr. at 17–18.) The car's windows were closed. Several agents were shouting different directions, often in English, and talking over one another. Emily was evidently distracted, turning to look from the agents on one side of the car to the agents shouting on the other side. A few seconds after Agent Scarborough told Emily to exit, agents smashed Orlando's window, causing Emily to "panic." (Tr. at 12–13.) This chaotic sequence occurred within about twelve seconds.

Once the driver's door was open, Agent Scarborough told Emily to exit again, and she unbuckled her seatbelt and reached for the door handle. (Ex. 6 at 2:30–2:41.) Just then, Orlando exited the car and was tackled. Emily turned to look, and Agent Scarborough then opened the passenger-side door and pulled her out—mere seconds after he commanded her to exit. This evidence shows that Emily *did* attempt to comply with Agent Scarborough's second command to exit but was interrupted by his actions.

The government points out that Emily admitted she was from Venezuela. But hailing from another country is not reason to suspect unlawful presence. *Brignoni-Ponce*, 422 U.S. at 886; *accord United States v. Munoz*, No. 12-cr-40092-01-KES, 2012 WL 6012811, at *4 (D.S.D. Dec. 3, 20212) (inability to produce document showing proof of legal presence does not give rise to a reasonable suspicion that person is "an illegal immigrant");

*cf. United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021) (finding probable cause for warrantless arrest when noncitizen "present[ed] a Mexican passport as his only identification, [*and*] admitted that he didn't have any documents that would allow him to be in the United States legally") (quotation omitted). Agents didn't follow up their nationality question by asking what Emily's immigration status was. (Tr. at 29.) Without more, her country of origin did not support a belief that Emily was here unlawfully.

The government next claims there was reasonable belief of unlawful presence because Emily "admitted that she . . . did not have legal documentation to be in the United States." (Gov't Supp. Br. at 4.) This parrots the I-213 Form but is belied by the rest of the record. (Ex. 2 at 3.)

At the hearing, Agent Marcus acknowledged that agents did not know Emily's status and didn't ask about it. (Tr. at 28–29.) The government's footage shows that Emily directed agents to where her ID was in the car. (*See* Tr. at 44–45.) They failed to retrieve it before taking her into custody. Significantly, the I-213 Form itself acknowledges that Emily passed a credible-fear interview, applied for relief before an immigration judge, and was regularly attending immigration check-ins during the pendency of her application. (Ex. 2 at 3–4.) The government's claim that Emily "admitted that she . . . did not have legal documentation" or that agents knew she lacked status severely mischaracterizes the record. (Gov't Supp. Br. at 4.)

Finally, the government claims that Emily attempted to escape, demonstrating reasonable belief that she was unlawfully present. As explained below, I find that Emily did not attempt to escape. Therefore, this claim doesn't support the first, unlawful-presence, prong of § 1357(a)(2).

***Second***, the government argues that there was a reasonable belief that Emily was likely to escape before a warrant could be obtained for her arrest, satisfying the second prong of § 1357(a)(2).

Under the "likely to escape" prong, agents must consider whether, after getting a warrant, they "would be able to arrest the noncitizen . . . at the scene of encounter . . . [***or***] at another clearly identifiable location." *Walther Ademir A.S. v. Blanche*, No. 26-cv-2804-LMP-SGE, 2026_WL1734906, at *3 (D. Minn. June 16, 2026) (cleaned up) (collecting cases); *see also* Ex. 9 at 4 (guidance from Acting Director of ICE for "immigration officers" authorized to conduct warrantless arrests under § 1357(a)(2) and describing this definition as the "plain meaning" of "likely to escape").[2]

[2] Counsel for the government Special Assistant United States Attorney Ganzhorn fails to address this "plain meaning" of the "likely to escape" prong. He avoids discussing or calling the Court's attention to the extensive caselaw interpreting "escape" in the context of this statute. Instead, Mr. Ganzhorn spends several pages explaining that "escape" does not mean "evade," relying solely on his own novel statutory interpretation and a dictionary citation. (Gov't Supp. Br. at 5–7.) This avoidance coupled with Mr. Ganzhorn's borderline mischaracterization of the facts is at best unprofessional.

The government claims this prong was met because Emily "was obstreperous and noncompliant" when handcuffed (Gov't Resp. at 22), because Orlando "resisted arrest to the point of wrapping his arm around a broken window before [Emily] was put in handcuffs," (*id.*), because Emily "admitted to being from Venezuela and having no legal right to be in the United States" (Gov't Supp. Br. at 7), and because "she provided no evidence that would negate a reasonable belief that she was an escape risk." (*Id.*)

These claims fail for several reasons.

I've already found some of the government's claims false. Emily tried to comply with Agent Scarborough's command to exit the vehicle and did comply with questions about her age, country of origin, and possession of identification. There is simply no support in the videos or testimony for the claim that Emily admitted to unlawful presence.

Other claims lack basic logic. Take, for example, the government's position that admitting Venezuelan nationality shows likelihood of escape. "To hold that a noncitizen is likely to escape merely because they are removable would effectively collapse § 1357(a)(2)'s two distinct requirements into one." *Jefferson G.H.L.*, 2026 WL 1229623, at *3. If every noncitizen that is here illegally is presumed likely to escape authorities, then § 1357(a)(2)'s second, independent requirement is rendered superfluous." *Id.*

The government's claim that Orlando's actions implicate Emily's likelihood of escape lacks both logic and particularity. *See Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 946 (D. Minn. 2017) (likely-to-escape prong requires particularized showing) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). The government doesn't explain how Orlando holding the window of his car shows that Emily would likely escape. Other record evidence suggesting that Emily was likely to escape because of her partner's arrest is woefully generic. (*See* Tr. at 56 (Agent Marcus testifying that it is "common" that a person whose boyfriend is arrested is "not going to stick around" while agents obtain a warrant).)

Finally, the government misplaces its own burden when it suggests that *Emily* failed to provide evidence to support a reasonable belief that she was not likely to escape. *See Jefferson G.H.L.*, 2026 WL 1229623, at *3 (government must show reasonable belief of likelihood of escape). The government presents no evidence to support a *reasonable* belief that Emily couldn't later be apprehended at "another identifiable location." *Walther Ademir A.S.*, 2026_WL1734906, at *3; Ex. 9 at 4 That's because agents didn't bother to ask Emily where she lived, where she worked, or if she had family nearby. Emily told agents she had ID, and they declined to inspect it.

The remaining question is whether Emily resisted handcuffing efforts. The answer is no. Emily is scarcely over five feet and ninety pounds and was wearing sweats and socks on a snowy morning in Grand Forks, surrounded by seven agents and a dog. She was plainly terrified and panicking. As agents pulled her from the car onto the icy parking lot, her phone fell. She stumbled retrieving it and "took a couple steps." (Tr. at 54.) An agent was gripping her throughout, causing Emily's fingernail to break. She flailed in pain, moving her hand in front of her to look at the injury. Still, agents finished handcuffing her within thirty seconds. I find under the totality of circumstances that Emily did not resist arrest while being handcuffed.

The government failed to demonstrate that it was unreasonable for agents to believe they could not first have obtained a warrant before arresting Emily at another identifiable location.

* * * * *

In sum, I find that Emily's warrantless arrest was not justified under either § 1357(a)(5) or § 1357(a)(2). The arrest was therefore unlawful *ab initio*, and the proper remedy is release. *See Espinoza-Avalos v. Blanche,* 8:26-cv-191, 2026 WL 1396593, at *4 (D. Neb. May 19, 2026) (citing *Hector J.A.S. v. Shea*, 26-cv-2242-JRT-DLM, 2026 WL 1243500, at *3 (D. Minn. May 6, 2026))). I therefore recommend that the habeas petition be granted and that Emily be released immediately.

Because I find that Emily's arrest violated the statute, I do not reach her remaining statutory or constitutional arguments.

## IV. Recommendation

Upon careful consideration of the entire record, IT IS HEREBY RECOMMENDED that:

1. Emily's petition for a writ of habeas corpus (Dkt. No. 1) be GRANTED;

2. The government be ORDERED to immediately release Emily in Minnesota, at a time and place communicated in advance to counsel, and with all her possessions; and

3. The government be ORDERED promptly to file an update on the docket showing that such release has taken place.

Date: July 18, 2026

*s/ Elsa M. Bullard*
Elsa M. Bullard
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under D. Minn. LR 72.2(b)(1), "[a] party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy of the recommended disposition, *unless the court sets a different deadline*." (Emphasis added.) The Court modifies the deadline such that objections are due on or before **July 24, 2026**. Responses to objections are due on or before **July 28, 2026**. All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).